AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )   Case No.  MJ17-526
)
Two Facebook accounts: "Maria Garcia" with ID number )
100012398678974 and "Maria Tekeraoi" with ID number )
100014362298473, further described in Attachment A. )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
Two Facebook accounts: "Maria Garcia" with ID number 100012398678974 and "Maria Tekeraoi" with ID number 100014362298473, further described in Attachment A.

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*
See attachment B for list of items to be seized.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841 and 846 | distribution of controlled substances and conspiracy; importation of controlled |
| 21 U.S.C. § 960 and 963 | substances and conspiracy |

The application is based on these facts:
See affidavit of Special Agent Terry D. Stinson

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Terry D. Stinson, CGIS Special Agent
*Printed name and title*

Sworn to before me pursuant to CrimRule 4.1.

Date: _____12/20/2017_____

_____
*Judge's signature*

City and state:  Seattle, Washington

U.S. Magistrate Judge Brian A. Tsuchida
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID 100012398678974 and with the Facebook user ID 100014362298473 that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

## I.     Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the
possession, custody, or control of Facebook, including any messages, records,
files, logs, or information that have been deleted but are still available to Facebook,
or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f),
Facebook is required to disclose the following information to the government for
each user ID listed in Attachment A:

   (a)     All contact and personal identifying information, including full name,
           user identification number, birth date, gender, contact e-mail
           addresses, Facebook passwords, Facebook security questions and
           answers, physical address (including city, state, country, and zip
           code), telephone numbers, screen names, websites, and other personal
           identifiers.

   (b)     All activity logs for the account and all other documents showing the
           user's posts and other Facebook activities;

   (c)     All photos and videos uploaded by that user ID and all photos and
           videos uploaded by any user that have that user tagged in them;

   (d)     All original photos containing original EXIF data;

   (e)     All profile information; News Feed information; status updates; links
           to videos, photographs, articles, and other items; Notes; Wall
           postings; friend lists, including the friends' Facebook user
           identification numbers; groups and networks of which the user is a
           member, including the groups' Facebook group identification
           numbers; future and past event postings; rejected "Friend" requests;

comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(f)     All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All information about the Facebook pages that the account is or was a "following";

(l)     All past and present lists of friends created by the account;

(m)     All records of Facebook searches performed by the account;

(n)     All information about the user's access and use of Facebook Marketplace;

(o)     The types of service utilized by the user;

(p)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(q)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(r)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

(s)     Any and all location information associated with the Facebook account identified in attachment A.  This could be general information such as the state and city the user identifies as their home on their Facebook profile, more refined information such as business names and addresses of places the user has "Checked In" at, the most precise information such as GPS latitude and longitude coordinates obtained when the user is active on Facebook, where postings were associated with, where a picture was taken, and where the user was when a post or message was created.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of violations of Title 21, Sections 841(a)(1), 846, 960, and 963 in 2016 and later, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) The importation and other distribution and transportation of controlled substances, including prepatory steps and follow up actions realted to any such scheme;

(b) Payment or planned payment or compensation in any form for any such importation or distribution of controlled substances;

(c) Recruitment or attempted recruitment or retention of any participants or prospective participants in any such scheme to import or otherwise distribute controlled substances;

(d) Records relating to who created, used, or communicated with the user IDs, about matters relating to the crimes described above, including records that help reveal their identities and whereabouts.

(e) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crimes described above.

(f) All subscriber records associated with the specified accounts, including name, address, local and long distance telephone connection records, or records of session times and durations, length of service (including start date) and types of service utilized, telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address, and means and source of payment for such service including any credit card or bank account number.

(g) Any and all other log records, including IP address captures, associated with the specified accounts;

(h) Any records of communications between Facebook and any person about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users about the specified account. This to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber as a result of the communications.

## CERTIFICATE OF AUTHENTICITY OF
## DOMESTIC RECORDS PURSUANT TO FEDERAL
## RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury

by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the

information contained in this certification is true and correct.  I am employed by

Facebook, and my title is _____.  I am qualified to

authenticate the records attached hereto because I am familiar with how the records

were created, managed, stored, and retrieved.  I state that the records attached

hereto are true duplicates of the original records in the custody of Facebook.  The

attached records consist of _____ **[GENERALLY DESCRIBE**

**RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of

the occurrence of the matter set forth by, or from information transmitted by, a

person with knowledge of those matters, they were kept in the ordinary course of

the regularly conducted business activity of Facebook, and they were made by

Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or

system that produces an accurate result, to wit:

902 Certificate - 1

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                            Signature

**AFFIDAVIT**

STATE OF WASHINGTON        )
                           )        ss
COUNTY OF KING             )

I, Coast Guard Investigative Service Special Agent Terry D. Stinson, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with a two Facebook user IDs that are stored at premises owned, maintained, controlled, or operated by Facebook, a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent (S/A) with the U. S. Coast Guard Investigative Service (CGIS), and have been since October, 2009.  I have been an active duty U. S. Coast Guard member for over 20 years and have participated in multiple aspects of federal law enforcement within that timeframe.  Currently, I am assigned to the CGIS, Northwest Region office in Seattle, WA.  In my official capacity I have investigated violations of federal and state law along with violations of the Uniform Code of Military Justice.  My training includes attending both the Criminal Investigators Training Program at the Federal Law Enforcement Training

AFFIDAVIT OF TERRY D. STINSON

USAO No. 2016R01231 - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Center as well as the Naval Criminal Investigative Service's Special Agent Basic Training Program.  As part of my duties as a CGIS S/A, I have investigated drug trafficking organizations and their ability to traffic cocaine, methamphetamine, and heroin globally.  I have conducted and/or participated in numerous investigations involving allegations, such as; sexual assault, rape, international drug smuggling, money laundering, drug manufacturing, robbery, weapons smuggling, alien smuggling, and child pornography.  I have worked, led, and participated in multiple drug trafficking investigations and operations during my career.  My training also encompasses other investigative experiences and training  not enumerated herein.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other officers, agents, and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Sections 841(a)(1), 846 (distribution of controlled substances and conspiracy), 960 and 963 (importation of controlled substances and conspiracy) have been committed by persons including Marelvis Jacquelin AHUMADA GARCES, aka JACQUELIN, and others.  There also is probable cause to search the information described in Attachment A and Section I of Attachment B for evidence of these crimes, as described in Section II of Attachment B.

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

### THE INVESTIGATION

5.    **Summary:**  This affidavit is in support of a search warrant for two Facebook accounts:  1)  for the Facebook account name "Maria Garcia," Facebook ID number 100012398678974, which will hereafter be referred to as "TARGET FACEBOOK ACCOUNT 1," and 2) the Facebook account name "Maria Tekeraoi," Facebook ID number 100014362298473, which will hereafter be referred to as "TARGET FACEBOOK ACCOUNT 2."

6.    As detailed below, both TARGET FACEBOOK ACCOUNTS are used by Marelvis Jacquelin AHUMADA GARCES, aka JACQUELIN.  The investigation has shown that AHUMADA GARCES uses the TARGET FACEBOOK ACCOUNTS to recruit and coordinate professional mariners to smuggle controlled substances from South and Central America to North America and Europe via commercial container vessels.

7.    **Motor Vessel (M/V) _CAP JACKSON_ Seizure:**  On September 3, 2016, the Royal Canadian Mounted Police (RCMP) seized approximately 196 kilograms of cocaine that had been smuggled to British Columbia on board the container ship M/V (Motor Vessel) _Cap Jackson_.  Refua KABUTA, aka Rebua KABUTA, is a professional mariner from the Republic of Kiribati who was a crew member of the M/V _Cap Jackson_ at the time of the seizure.  According a crew member interviewed later who admitted bringing a package on board the M/V _Cap Jackson_ in Colombia, KABUTA and at least one other mariner had attempted to lower that package (which turned about to be a load of cocaine) to an awaiting vessel when the M/V _Cap Jackson_ departed the Fraser River in British Columbia, Canada. A pilot boat noticed the package, retrieved it, and turned it over to

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 3

Canadian authorities.  KABUTA's name appears on the friends list for both TARGET FACEBOOK ACCOUNT 1 and TARGET FACEBOOK ACCOUNT 2.

8.      After the seizure in Canada, the M/V *Cap Jackson* sailed to Oakland, California, where U.S. law enforcement officials boarded the vessel on September 7, 2016.  During that operation, officers recovered the Colombian telephone number 57-3013615307 labeled as "Kimmy" from a mobile telephone recovered from KABUTA.  Also located in KABUTA's mobile telephone was the British Columbia telephone number (604) 704-1178.  Analysis showed that KABUTA's mobile telephone communicated with 57-3013615307 September 2, 2016, prior to the attempted at-sea transfer of the cocaine, and then KABUTA's phone began communicating with the telephone number (604) 704-1178 on September 2 and 3, 2016.

9.      On October 8, 2016, I assisted U.S. Customs and Border Protection (CBP) with the secondary inspection of Rebua KABUTA at Los Angeles International Airport (LAX) as he traveled to Kiribati through the United States. During the secondary inspection of KABUTA, CBP officers located in KABUTA's personal belongings a mini composition notebook with "R Kabuta Notebook" handwritten on the cover.  The back cover of the notebook contained a handwritten notation of the British Columbia mobile telephone number (604) 704-1178.  With the assistance of RCMP, the telephone number (604) 704-1178 was identified as being subscribed to by a person who had recently traveled to Colombia.  Phone records also showed that the phone, on the night the cocaine was dropped into the water, was in the vicinity of a marina near the drop site. Also located in KABUTA's notebook was the handwritten email address BRAYLIN777@hotmail.com with the name "Jackie" written below it.  As

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 4

detailed below, the investigation has shown that Marelvis Jacquelin AHUMADA
GARCES, aka JACQUELIN, identified her email address as
BRAYLIN777@hotmail.com in two Western Union money transfers in which she
sent funds from Panama to Colombia.

10.     Located in KABUTA's notebook were multiple handwritten
Western Union money transfer control numbers (MTCN) for individuals in names
other than his own.  According to KABUTA's notebook, two of the MTCN's, 106-
360-6406 and 471-152-2649, were associated to a "Rawata ITINNEITA".
Western Union information showed both MTCN's were initiated on August 29,
2016, by an individual from two separate locations in Panama City, Panama and
were paid to a Ratawa ITINNEITA in Kiribati.  Both wires were for $1,934.69
each in U.S. funds.  According to Western Union, ITINNEITA also received a wire
from Marelvis Jacquelin AHUMADA GARCES, aka JACQUELINE.

11.     **M/V *RIO DE JANEIRO* Seizure:**  According to open source
reporting, on October 20, 2016, Teisi BURATAAKE was one of nine Kiribati
crewmembers arrested by Italian law enforcement in an attempted cocaine
smuggling event in Gioia Tauro, Italy.  BURATAAKE and eight other Kiribati
crewmembers allegedly attempted to smuggle approximately 385 kilograms of
cocaine from South America onboard the M/V *RIO DE JANEIRO* when they were
apprehended in Italy.  BURATAAKE is a professional mariner from Kiribati
whose name appeared on TARGET FACEBOOK ACCOUNT 1 friends list.

12.     **Confidential Informant (CI) Information:**  In March 2017, law
enforcement officials contacted a confidential informant (CI) in the United States
following the CI's involvement in a suspicious incident in British Columbia,
Canada onboard a commercial container vessel.  (The CI had admitted to Canadian

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 5

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

authorities that he/she had been involved in drug smuggling on board the vessel from Colombia to Mexico. The CI has not been paid for any cooperation, nor have I made any promises about avoiding prosecution. I believe, however, the CI is providing information in hopes of retaining his/her job as a professional mariner and to avoid prosecution.) The CI's container vessel had arrived in British Columbia after its port call in Seattle, Washington. According to the CI, in February or March of 2017 (before the CI communicated with law enforcement), the CI along with a second crewmember successfully smuggled an estimated 20 to 30 kilograms of what the CI believed to be cocaine from Cartagena, Colombia to Manzanillo, Mexico onboard that same container vessel. The suspected cocaine was contained in Everlast punching bags. In the September, 2016 seizure from the M/V *Cap Jackson* described above, the cocaine also was contained in Everlast punching bags.

13.     The CI said they were to be paid $1,000 per kilogram of cocaine smuggled. The CI was initially recruited by a crewmember onboard the CI's vessel to smuggle cocaine from Colombia to Mexico. Following the CI's initial recruitment, the other crewmember began communicating with the Colombian-based drug trafficking organization (DTO) via TARGET FACEBOOK ACCOUNT 1. The CI identified the TARGET FACEBOOK ACCOUNT 1 name the crewmember was communicating with as "Mariana Garcia." The CI identified the person communicating via TARGET FACEBOOK ACCOUNT 1 as a Colombian female. The CI said he/she had met the female on one occasion while in port in Cartagena, Colombia in February or March 2017. The CI said the DTO attempted to recruit the CI to smuggle cocaine to the Pacific Northwest and Europe

for future smuggling events, but the CI was concerned about U.S. and European law enforcement interdicting them.

14.     The CI said prior to the Colombia to Mexico smuggling event described above, the DTO provided the CI with a mobile telephone and the Colombian telephone number 57-3013615307 (this telephone number was previously identified in KABUTA's mobile telephone and listed as "Kimmy") to be called for coordination during the operation.  However, the CI said TARGET FACEBOOK ACCOUNT 1 is how the CI communicated with their handler the most during the cocaine smuggling events in Mexico.

15.     On April 25, 2017, the CI told me they had been contacted via TARGET FACEBOOK ACCOUNT 1 and was told the DTO had sent money to the CI's family from Panama earlier that month.

16.     On April 27, 2017, the CI provided me with the following images for Target Facebook Account 1:



17.     On April 30, 2017, the CI said they had been paid approximately $8,000 to date for the smuggling event the CI had previously conducted from

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Colombia to Mexico.  The CI said he/she and the other crewmember were still owed approximately $16,000 total from the previous cocaine smuggling event.

18.     On May 19, 2017, the CI told me they had sent a Facebook Messenger request to TARGET FACEBOOK ACCOUNT 1 and were awaiting a response.

19.     On May 28, 2017, the CI informed me the CI was contacted by a female from TARGET FACEBOOK ACCOUNT 1.  The CI said the female told the CI she would be in Panama "for sending money for the people who works for them." [sic]  Based on this investigation and my experience in investigating such matters, I believe, "the people who works for them" was a direct reference to maritime cocaine smugglers and those individuals structuring payments via Western Union.

20.     On May 31, 2017, I conducted a debrief of the CI in Seattle, Washington.  During the debrief, the CI said the female they had been communicating with via TARGET FACEBOOK ACCOUNT 1 identified herself as "JACQUELIN".

21.     On June 8, 2017, the CI told me that during the previously reported Mexico smuggling event, JACQUELIN contacted them via TARGET FACEBOOK ACCOUNT 1 to confirm everything was "ok" during and after when the CI made the transfer at sea of the suspected cocaine in Mexico.  The CI said JACQUELIN then hired someone to send money to the CI's family as payment for the cocaine smuggling event.

22.     On June 10, 2017, the CI provided me with Western Union transaction information for a Yuranis Paola AHUMADA GARCES from Panama City, Panama.  The CI said Yuranis AHUMADA GARCES previously sent money

AFFIDAVIT OF TERRY D. STINSON

USAO No. 2016R01231 - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

via Western Union from Panama to a suspected maritime drug smuggler's family member following a successful maritime cocaine smuggling event.

23.    On June 21, 2017, the CI said that JACQUELIN was recruiting the CI to smuggle a load of cocaine to Europe from Colombia onboard their vessel.

24.    On June 22, 2017, the CI said JACQUELIN was, "preparing the food" for when they had time to meet.  Based on my prior investigative experience, I believe "food" was a code word for drugs or cocaine.  The code word "food" has been used in other parts of this investigation to mean cocaine by the DTO and those tasked with smuggling cocaine.

25.    The CI stated that JACQUELIN was attempting to prepare a "small load.. as it takes time to prepare big loads."  The CI said JACQUELIN attempted to recruit Timea ATATA, a second crewmember onboard the CI's vessel to help smuggle a load of cocaine to Europe.  The CI said ATATA was too scared to smuggle due to the nine Kiribati crewmembers who were previously arrested while attempting to smuggle approximately 385 kilograms of cocaine to Europe onboard the M/V RIO DE JANEIRO on or about October 20, 2016.  ATATA was identified as being a Facebook friend of TARGET FACEBOOK ACCOUNT 2.

26.    The CI said JACQUELIN told the CI via TARGET FACEBOOK ACCOUNT 1 that "the person in spain" [sic] was a problem for her and that person blamed her for the lost load of cocaine.

27.    According to Western Union information, on April 11, 2017, Yuranis AHUMADA GARCES sent two wires to an individual in Tarawa, Kiribati; both wires were the same amount $1934.69 USD each, with one wire sent at 1:16 PM and the second sent at 4:47 PM.  The wires were sent from different

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

locations in Panama City, Panama.  Payments were received in Australian dollars ($ 2498.62 AUD each).

28.     On July 18, 2017, the CI confirmed that JACQUELIN was still residing in Panama and was working toward her Panamanian citizenship.

29.     On November 2, 2017, the CI said he/she also communicated with JACQUELIN on TARGET FACEBOOK ACCOUNT 2.  According to the CI, in October 2017, JACQUELIN asked the CI to help her find "frens" [sic] on the M/V *Monte Cervantes*.  The CI provided me a screen shot from the CI's conversation with JACQUELIN via TARGET FACEBOOK ACCOUNT 2 where JACQUELIN stated, "I think I go to costa rica to look same work three have much ship Kiribati crew". [sic]  The CI confirmed that JACQUELIN meant she intended to go to Costa Rica in order to recruit Kiribati mariners to smuggle cocaine.

30.     **Western Union Transactions:**  Western Union records showed that between May 31, 2016, and July 7, 2016, Marelvis Jacquelin AHUMADA GARCES sent three wires from Santamarta, Colombia to two separate Kiribati nationals in Tarawa, Kiribati.  On 31 May, 2016, AHUMADA GARCES sent two wires: one at 12:24 pm to Ratawa ITINNEITA in the amount of $345.62, and the second, at 12:36 pm, for $313.15 to Raabwa KARAWAITI.  On July 7, 2016, AHUMADA GARCES sent $265.42 to Raabwa KARAWAITI.

31.     According to Western Union, on December 24, 2016 Yuranis AHUMADA GARCES sent two wires from Valledupar, Colombia to Tarawa, Kiribati.  Both wires originated as Colombian Pesos with a U.S. dollar value of $1,020.43 and were received in Kiribati as Australian Dollars ($ 1388.32 AUD).  One wire was sent to Tariri TIANUARE and the other to Terakoua MARAITI.  TIANUARE has entered the U.S. on numerous occasions, and his travel patterns

AFFIDAVIT OF TERRY D. STINSON

USAO No. 2016R01231 - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

appear to be consistent with those of a professional mariner.  Of note, TIANUARE was previously identified by law enforcement as one of the Kiribati mariners identified on the TARGET FACEBOOK ACCOUNT 1 friends list.

32.      According to Western Union, between August 27, 2016, and June 10, 2017, Yuranis AHUMADA GARCES received ten wires in Valledura, Colombia.  All of these wires were from Marelvis Jacquelin AHUMADA GARCES.  Eight of the payments were sent from Panama.  One payment was sent from Limon, Costa Rica ($200 USD), and one payment was sent from Tavernes de la Valldinga, Spain (€100 EURO).

33.      According to Western Union, Marelvis Jacquelin AHUMADA GARCES conducted two Western Union transactions where she indicated her email address as being BRAYLIN777@hotmail.com.  The first transaction occurred on September 16, 2017, where she sent $60.00 from Panama City, Panama to Christian ADARRAGA AHUMADA in Valledupar, Colombia.  On September 29, 2017, Marelvis Jacquelin AHUMADA GARCES identified her email as being BRAYLIN777@hotmail.com in a transaction to Yuranis Paolo AHUMADA GARCES in the amount of $195.00.  The transaction originated in Panama City, Panama and the transaction was received in Valledupar, Colombia.  As noted above, the BRAYLIN777@hotmail.com email address was previously discovered, handwritten in the notebook belonging to KABUTA during his secondary inspection at LAX.

34.      From June 21, 2017 to September 29, 2017, Marelvis Jacquelin AHUMADA GARCES conducted 12 transactions via Western Union (including the two aforementioned transactions where she identified her email address as BRAYLIN777@hotmail.com).  Nine of those transactions originated in Almirante,

AFFIDAVIT OF TERRY D. STINSON

USAO No. 2016R01231 - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Panama and three originated in Panama City, Panama.  On July 1, 2017, Marelvis Jacquelin AHUMADA GARCES sent $486.60 to Raimon MATANG in Tarawa, Kiribati.  On August 30, 2017, Marelvis Jacquelin AHUMADA GARCES sent $1074.33 to Katia Luz EGUIS Pereira in Santa Cruz de Tenerife, Spain.

35. **Law Enforcement Review of TARGET FACEBOOK ACCOUNTS 1 & 2:**  In May 2017, law enforcement officials began capturing the information from the publicly available Facebook friends list from TARGET FACEBOOK ACCOUNT 1.  During the review of the gathered information, officers and agents identified that TARGET FACEBOOK ACCOUNT 1 was Facebook "friends" with 131 suspected professional mariners from the Republic of Kiribati and the country of Tuvalu.  Based on U.S. travel records, 61 of those mariners had previously entered the United States onboard commercial vessels. Since August 1, 2016, eight of those mariners have traveled through the Western District of Washington onboard commercial vessels a combined total of 16 times.

36. By June 2017, the TARGET FACEBOOK ACCOUNT 1 name, "Mariana Garcia" was changed to "Maria Garcia".  On May 2, 2017, it was confirmed that although the name for TARGET FACEBOOK ACCOUNT 1 was changed, the Facebook ID number remained the same.  I viewed the Facebook page under each name and the profile picture and profile cover were the same under both names, providing further evidence that the account remained the same with simply a name change as described above.

37. In July 2017, TARGET FACEBOOK ACCOUNT 1's previously publicly available friends list became restricted.  Law enforcement officials were no longer able to view the Facebook friends list for TARGET FACEBOOK ACCOUNT 1.

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

38.     On September 25, 2017, I conducted a Facebook query for TARGET FACEBOOK ACCOUNT 1.  During my query, I found under the "Other Names" section of the "About" tab of TARGET FACEBOOK ACCOUNT 1, the "Nickname" listed as "jacky".

39.     On November 3, 2017, during a review of TARGET FACEBOOK ACCOUNT 2, I identified 29 of the 55 friends listed in the Facebook friends list as being "friends" with TARGET FACEBOOK ACCOUNT 1 as well as TARGET FACEBOOK ACCOUNT 2.  The majority of the Facebook friends listed in TARGET FACEBOOK ACCOUNT 2 appear to be professional mariners.  Based on U.S. travel records, 32 of those mariners had previously entered the United States onboard commercial vessels.  Since August 1, 2016, seven of those mariners have traveled to or through the Western District of Washington onboard commercial vessels a combined total of 14 times.  Since August 1, 2016, A combined total of 15 Facebook friends with TARGET ACCOUNT 1 and TARGET ACCOUNT 2 have traveled to or through the Western District of Washington onboard commercial vessels an approximate total of 30 times.

40.     In conclusion, information revealed through law enforcement encounters, customs inspections, financial transactions, and a CI information revealed that there is probable cause to believe that Marelvis Jacquelin AHUMADA GARCES, aka JACQUELIN is using TARGET FACEBOOK ACCOUNT 1 and TARGET FACEBOOK ACCOUNT 2 to help facilitate cocaine smuggling from Colombia to North America and Europe via container vessels.

## BACKGROUND RELATED TO FACEBOOK SOCIAL NETWORKING SERVICES

41.     I am aware from my experience and training, and consultation with other investigators, of the following information about Facebook:

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

42.      Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

43.      Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

44.      Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

45.      Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 14

only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

46.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile (subject to the privacy settings selected by the account user).

47.     Facebook allows users to upload photos and videos.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 15

48.     Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

49.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

50.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

51.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

52.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

AFFIDAVIT OF TERRY D. STINSON

USAO No. 2016R01231 - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

53.      Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

54.      The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

55.      Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

56.      In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

57.      Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group.  Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

AFFIDAVIT OF TERRY D. STINSON

USAO No. 2016R01231 - 17

58.     Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

59.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

60.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services,

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

as well as records of any actions taken by the provider or user as a result of the communications.

61.     Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.  I believe such information is likely to help me locate the fugitive described in this affidavit.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

62.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) for the Target Facebook Account described in Attachment A, as more particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## REQUEST FOR NONDISCLOSURE AND SEALING

63.     The government requests, pursuant to the preclusion of notice provisions of Title 18, United States Code, Section 2705(b), that Facebook be ordered not to notify any person (including the subscriber or customer to which the materials relate) of the existence of this warrant for such period as the Court deems appropriate.  The government submits that such an order is justified because notification of the existence of this Order would seriously jeopardize the ongoing investigation.  Such a disclosure would

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

give the subscriber an opportunity to destroy evidence, change patterns of behavior, notify confederates, or flee or continue any flight from prosecution.

64.     It is further respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant.  I believe that sealing this document is necessary because the items and information to be seized are relevant to an ongoing investigation, and law enforcement may attempt to conduct searches and intercept large shipments of controlled substances. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

//

//

//

AFFIDAVIT OF TERRY D. STINSON

USAO No. 2016R01231 - 20

## **CONCLUSION**

65.     Based on the forgoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  *See* 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  Accordingly, by this Affidavit and Warrant I seek authority for the government to search all of the items specified in Section I, Attachment B (attached hereto and incorporated by reference herein) to the Warrant, and specifically to seize all of the data, documents and records that are identified in Section II to that same Attachment.

Respectfully submitted,

Terry D. Stinson
Special Agent
Coast Guard Investigative Service

The above-named agent provided a sworn statement attesting to the truth of the contents of the foregoing affidavit on the 20th day of December, 2017.

BRIAN A. TSUCHIDA
United States Magistrate Judge

AFFIDAVIT OF TERRY D. STINSON
USAO No. 2016R01231 - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE
5220
SEATTLE, WASHINGTON 98101
(206) 553-7970